909 A.2d 286 (2006)
388 N.J. Super. 454
In the Matter of the CIVIL COMMITMENT OF M.L.V.
Superior Court of New Jersey, Appellate Division.
Submitted September 13, 2006.
Decided October 24, 2006.
*288 Yvonne Smith Segars, Public Defender, for appellant (Lewis P. Sengstacke, Assistant Deputy Public Defender, of counsel and on the brief).
Anne Milgram, Acting Attorney General, for respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; Lisa Marie Albano, Deputy Attorney General, on the brief).
Before Judges WEFING, C.S. FISHER and YANNOTTI.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
M.L.V. appeals from temporary and final orders of commitment entered by the Law Division pursuant to the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to-27.38 (SVPA or the Act). We affirm.

I.
We begin our consideration of the appeal with a brief statement of the relevant facts, drawn from the record of the final commitment hearing. M.L.V.'s record dates to April 1971, when he was fifteen years old. In January 1973, M.L.V. was sentenced to a juvenile detention facility after he caused substantial damage to six new cars. He was paroled in August 1973 and in October 1973, while on parole, M.L.V. and a friend abducted a 19-year old woman in a parking lot, forced her into her car at knife point and drove several miles to a wooded area, where they forced the woman to remove her clothing and raped her. After the assault, M.L.V. and his accomplice drove south with their victim. Two days later, the victim was able to seek assistance. M.L.V. and his accomplice were arrested in Virginia. M.L.V. was returned to the juvenile detention facility. He was released in February 1975.
On August 14, 1976, M.L.V. broke into the apartment of J.M., a 64-year-old deaf mute woman. He was wearing a stocking over his head to conceal his identity. J.M. was asleep on the couch. M.L.V. awakened J.M. and forced her to go to the bedroom, where he tied her wrists and ankles to the bedposts. M.L.V. cut off J.M.'s clothes with a knife and raped her. When M.L.V. heard noises from a nearby apartment, he removed J.M.'s restraints, stole $75 from her purse and fled.
A few weeks later, on September 3, 1976, M.L.V. entered S.O.'s apartment. M.L.V. was wearing a stocking on his head but S.O. recognized him and called him by name. M.L.V. pointed a knife at S.O. and told her not to scream. M.L.V. allowed S.O. to go to the kitchen to feed her young child, but he kept one hand on her and, according to S.O., repeatedly ran the knife across her face. When S.O. screamed and *289 tried to pull away, M.L.V. punched her in the face and fled.
M.L.V. was arrested and charges were filed respecting the incidents involving J.M. and S.O.M.L.V. pled guilty of the rape while armed of J.M. He also pled guilty to breaking and entering S.O.'s apartment with intent to steal while armed. M.L.V. was sentenced to an indeterminate sentence of up to thirty years at the Adult Diagnostic and Treatment Center (ADTC) for the rape; a term of nine to ten years for the armed portion of the rape charge; a three to five-year term for breaking and entering with intent to steal; and two to three years for the armed portion of the breaking and entering charge.
M.L.V. escaped from the ADTC in August 1979 but he was captured and returned to that facility the following month. While out of confinement, M.L.V. and an accomplice committed a robbery. M.L.V. was convicted and sentenced to a twelve-year term for robbery, which was made concurrent to the previously imposed sentences. In March 1993, M.L.V. was released on parole after having been incarcerated for sixteen years.
In 1995, M.L.V. picked up a female hitchhiker. M.L.V. said that the woman agreed to perform oral sex and engage in sexual intercourse for money. M.L.V. paid the agreed upon price but the hitchhiker refused to engage in sexual intercourse and refused to return the money, which she claimed to have dropped outside the building where M.L.V. had taken her. M.L.V. said that he tied the woman's wrists and he went outside to look for the money. The woman escaped and called the police. The charges arising from this incident were downgraded to simple assault. M.L.V. pled guilty and he was sentenced to time served. Although M.L.V. had violated the conditions of his parole, the Parole Board (Board) did not revoke M.L.V.'s parole at this time.
On February 2, 1997, M.L.V. was arrested for burglary. While this charge was pending, M.L.V. was arrested for soliciting a prostitute who was in fact an undercover police officer. He pled guilty to a disorderly persons offense and was fined. A panel of the Board revoked M.L.V.'s parole and he was returned to the ADTC for evaluation, after which the panel re-affirmed its decision to revoke parole. Subsequently, in 1999, M.L.V. was convicted of the burglary and was sentenced to a concurrent four-year term. M.L.V. did not file an administrative appeal from the panel's decision to revoke parole until November 2000. The Board entertained the untimely appeal and upheld the panel's decision.
M.L.V. appealed the revocation of his parole to this court and, by opinion filed on September 30, 2002, we remanded the matter to the Board for reconsideration. M.L.V. v. N.J. State Parole Board, No. A-5103-00T3 (App.Div. September 30, 2002). In our opinion, we noted that the standards governing the revocation of parole of a sex offender committed to the ADTC were set forth in State v. Dalonges, 128 N.J.Super. 140, 148-49, 319 A.2d 257 (App. Div.1974), where we stated that:
[T]he parole of a sex offender cannot properly be revoked unless the reason for revocation is based at least in part upon the finding by the Parole Board and based upon a determination by the Diagnostic Center founded on adequate medical reasons, that defendant's violation of parole reflects emotional or behavioral problems as a sex offender and evidences that he is incapable of making any acceptable social adjustment in the community because of such problems and in fact requires further specialized *290 treatment as mandated by N.J.S.A. 2A:164-5.
We remanded the matter to the Board for a new evaluation and to reconsider whether revocation was warranted under Dalonges.
M.L.V. was subsequently evaluated by Mark Frank, Ph.D. (Frank), who concluded that the three prongs of the Dalonges test for parole revocation had not been met. Frank found that M.L.V.'s parole violation did, in fact, reflect his emotional and behavioral problems as a sex offender. However, Frank found that there was insufficient evidence upon which to conclude that M.L.V. is incapable of making an acceptable social adjustment. Frank further found that, although M.L.V. required further specialized sex offender treatment, continued custodial supervision was not required. Based on Frank's findings, the Board issued a decision dated January 22, 2003 continuing M.L.V.'s parole and directing his release from confinement upon the submission of an acceptable community plan.
In conformity with standard procedures, M.L.V. was evaluated at the ADTC prior to his release. On March 27, 2003, Emili Rambus, Psy.D. (Rambus) issued a "termination report" which recommended that M.L.V. participate in certain ADTC treatment programs. Rambus noted that while M.L.V.'s score on the Static 99 suggested he is at a high risk of sexual re-offending, his score on the MnSOST-R suggested a moderate risk.[1] The doctor stated that M.L.V.'s scores on both tests were elevated due to historical variables, which remain static. Rambus added, "[M.L.V.'s] high score on the Static 99 is mitigated by [the] therapeutic progress and [the] strict requirements of parole supervision. As such, from a clinical viewpoint, [M.L.V.'s] continuation on parole is appropriate. . . ." On April 2, 2003, the Board placed an administrative hold on M.L.V.'s release pending further evaluation for commitment under the SVPA.
Lawrence Allen Siegel, M.D. (Siegel) performed an evaluation and rendered a report dated April 3, 2003, in which he concluded that M.L.V. was highly likely to commit another sexual offense. Siegel wrote that, "because of his personality disorder and deviant sexual arousal, [M.L.V.] will have significant difficulty controlling future impulses to commit a sexual offense." Siegel recommended that M.L.V. be referred to the Special Treatment Unit (STU) for further care and treatment.
On April 24, 2003, the Attorney General filed a petition in the Law Division seeking M.L.V.'s commitment pursuant the SVPA and sought the issuance of a temporary order of civil commitment. On April 29, 2003, Judge Philip Lewis Paley entered an order temporarily committing M.L.V. to the STU pending a final commitment hearing.
M.L.V. thereafter filed a motion to dismiss the State's petition, arguing that the Attorney General was barred from seeking his commitment pursuant to the SVPA because the Board had decided to continue his parole. Judge Serena Peretti denied the motion for reasons stated on the record on June 6, 2003.
The final commitment hearing was held on November 12 and 13, 2003 before Judge *291 Philip Freedman, who placed his decision on the record on January 6, 2004. Judge Freedman also rejected M.L.V.'s contention that the Attorney General could not institute commitment proceedings simply because the Board had decided to continue M.L.V. on parole. Judge Freedman additionally determined that the State had presented clear and convincing evidence that M.L.V. was a sexually violent predator in need of commitment at the STU for control, care and treatment. The final commitment order was entered on January 6, 2004 and this appeal followed.
M.L.V. raises the following contentions for our consideration:
POINT I:
WHERE THE PAROLE BOARD HAS DECIDED THAT AN INMATE IS SUITABLE FOR RELEASE, THE ATTORNEY GENERAL SHOULD NOT BE PERMITTED TO CIRCUMVENT THAT DECISIONAND THE EXCLUSIVE JURISDICTION OF THIS COURTBY FILING A PETITION FOR CIVIL COMMITMENT UNDER THE SVPA.
A. THE ATTORNEY GENERAL WAS OBLIGED TO PURSUE ANY CHALLENGE TO THE PAROLE BOARD'S DECISION BY FILING AN APPEAL TO THIS COURT.
B. PRINCIPLES OF ADMINISTRATIVE COMITY BAR THE ATTORNEY GENERAL FROM ATTEMPTING TO CIRCUMVENT THE PAROLE BOARD'S DECISION IN THIS MATTER.
C. THE RELEVANT STATUTES SUPPORT THE CONCLUSION THAT THE PAROLE BOARD HAS EXCLUSIVE JURISDICTION OVER THE QUESTION OF WHETHER M.L.V. SHOULD BE RELEASED.
D. THE ATTORNEY GENERAL HAS NOT AND CANNOT ESTABLISH THAT THE PAROLE BOARD ABUSED ITS DISCRETION IN REINSTATING M.L.V.'S PAROLE.
POINT II.
THE STATE'S EXHIBITS WERE ALL HEARSAY, NOT ADMISSIBLE TO PROVE THE TRUTH OF THE MATTERS ASSERTED THEREIN AND CUMULATIVELY, THE EXHIBITS WERE INSUFFICIENT TO SUPPORT A FINDING IN FAVOR OF THE STATE.
POINT III.
THE STATE DID NOT CARRY ITS BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT M.L.V. WAS HIGHLY LIKELY TO RE-OFFEND SEXUALLY WITHIN THE REASONABLY FORESEEABLE FUTURE.
We have carefully considered these contentions in light of the record before us. For the reasons that follow, we are convinced there is no merit in the appeal.

II.
M.L.V. first argues that the Attorney General was barred from seeking his commitment pursuant to the SVPA because the Board had decided to continue M.L.V.'s parole. We disagree.
The SVPA provides for the involuntary commitment of persons who require "continued involuntary commitment as a sexually violent predator" as that term is defined in N.J.S.A. 30:4-27.26b. The Act provides the Attorney General with authority to initiate a court proceeding for the commitment of persons who are currently in psychiatric facilities. N.J.S.A. 30:4-27.28a. The Attorney General also may initiate proceedings for the commitment "of an inmate who is scheduled for release upon expiration of a maximum *292 term of incarceration. . . ." N.J.S.A. 30:4-27.28c. In addition,
The Attorney General, in the exercise of the State's authority as parens patriae, may initiate a court proceeding for the involuntary commitment of any person in accordance with the procedures set forth in this section by filing the required submission with the court in the jurisdiction in which the person whose commitment is sought is located.
[N.J.S.A. 30:4-27.28d (emphasis added).]
Contrary to M.L.V.'s assertions, the Act does not preclude the Attorney General from seeking commitment of a person who is on parole. Although N.J.S.A. 30:4-27.28c provides that the Attorney General may initiate commitment proceedings for an inmate "who is scheduled for release upon expiration of a maximum term of incarceration," that grant of authority is not an implicit limitation on the authority of the Attorney General to seek commitment under N.J.S.A. 30:4-27.28d "in the exercise of the State's authority as parens patriae. . . ." The statute does not foreclose the initiation of commitment proceedings for individuals who have been released on parole.
Indeed, the reference in N.J.S.A. 30:4-27.28d to the State's parens patriae power evidences the Legislature's intention to confer broad power on the Attorney General to initiate commitment proceedings when the Attorney General has reasonable grounds to believe a person is a sexually violent predator. "The authority of the State to civilly commit citizens is said to be an exercise of its police power to protect the citizenry and its parens patriae power to act on behalf of those unable to act in their own best interests." In re D.C., 146 N.J. 31, 47, 679 A.2d 634 (1996) (citing In re S.L., 94 N.J. 128, 136, 462 A.2d 1252 (1983)). "The State's common-law power to function as protector of the public interest is subject to either `enlargement or abridgement' by legislative authority." Id. at 49, 679 A.2d 634 (citing Alexander v. N.J. Power & Light Co., 21 N.J. 373, 380, 122 A.2d 339 (1956)).
In the SVPA, the Legislature imposed no limitation on the State's pariens patriae power to protect the public from the potential dangers posed by sexually violent predators. To the contrary, the Legislature clearly intended by its enactment of N.J.S.A. 30:4-27.28d to re-affirm the Attorney General's broad power to seek the commitment of "any person" in order to protect the public.
M.L.V. argues, however, that the Attorney General was bound by the Board's determination reinstating his parole, based on its assessment of the factors set forth in Dalonges. M.L.V. says that if the Attorney General disputed the Board's decision to release him on parole, the Attorney General was required to appeal the Board's decision to this court.
Again, we disagree. The Attorney General could have taken an appeal from the Board's decision and argued that the Board erred in deciding not to revoke M.L.V.'s parole. We express no view on whether such an appeal would have succeeded. However, this was not the only remedy available to the Attorney General in the circumstances. As an alternative to seeking the revocation of M.L.V.'s parole and his continued incarceration, the Attorney General was expressly authorized by the SVPA to seek M.L.V.'s civil commitment on the ground that he is a sexually violent predator.
We likewise reject M.L.V.'s assertion that principles of administrative comity required the Attorney General to defer to the Board's decision reinstating his parole. Citing City of Hackensack v. Winner, 82 N.J. 1, 410 A.2d 1146 (1980), *293 M.L.V. argues that the Board and the Attorney General had concurrent jurisdiction in the matter and, in the interest of comity of these administrative agencies, the Attorney General should have deferred to the Board's determination.
M.L.V.'s reliance on Winner is misplaced. The Attorney General and the Board did not exercise concurrent jurisdiction in this matter. The Board was empowered to determine whether to revoke M.L.V.'s parole. The Attorney General has no power to determine whether M.L.V.'s parole should or should not be revoked, nor does the Attorney General determine whether a person should be civilly committed pursuant to the Act. The Attorney General merely initiates proceedings in which the court decides whether there is clear and convincing evidence warranting an individual's civil commitment as a sexually violent predator. In the circumstances, the Attorney General was not required by principles of administrative comity to defer to the Board's decision.
M.L.V. additionally contends that the Attorney General cannot prove that the Board acted arbitrarily or capriciously in ordering his release on parole. However, the Attorney General was not required to make such a showing. Having elected to seek M.L.V.'s civil commitment under the SVPA, the Attorney General was only obligated to establish by clear and convincing evidence that M.L.V. is a sexually violent predator whose commitment is authorized by the Act.

III.
We turn to M.L.V.'s contention that the State failed to prove by clear and convincing evidence that he is a sexually violent predator in need of commitment under the Act.
The scope of appellate review of judgments of civil commitment is exceedingly narrow. In re Civil Commitment of V.A., 357 N.J.Super. 55, 63, 813 A.2d 1252 (App.Div.), certif. denied, 177 N.J. 490, 828 A.2d 917 (2003). An appellate court should give the "utmost deference" to the reviewing judge's determination of the appropriate balancing of societal interests and individual liberty. In re Commitment of J.P., 339 N.J.Super. 443, 459, 772 A.2d 54 (App.Div.2001) (citing State v. Fields, 77 N.J. 282, 311, 390 A.2d 574 (1978)). That determination will be subject to modification only where the record reveals "a clear abuse of discretion." Ibid.
In this matter, Judge Freedman found that the State had proven by clear and convincing evidence that M.L.V. suffers from a mental abnormality or personality disorder that presently causes him serious difficulty in controlling sexually harmful behavior such that he is highly likely to re-offend. In re Commitment of W.Z., 173 N.J. 109, 120, 801 A.2d 205 (2002) (citing N.J.S.A. 30.4-27.26). In our view, the judge's findings are amply supported by the credible evidence, specifically the testimony of the two expert witnesses presented by the Attorney General: Michael R. McAllister, M.D. (McAllister) and Natalie Barone, Psy.D. (Barone).
McAllister evaluated M.L.V. and submitted reports dated May 7, 2003 and October 20, 2003. McAllister concluded that M.L.V. remained a significant risk to sexually re-offend if released into the community. McAllister testified that he diagnosed paraphilia not otherwise specified (NOS), a condition that he described as a "central perversion" which involves sexual acts without consent. McAllister also diagnosed sexual sadism, which is sexual arousal due to the inducement of humiliation, fear and domination of the other party. McAllister testified that M.L.V.'s offense *294 history supported his diagnoses. McAllister also said that paraphilia NOS and sexual sadism predisposed M.L.V. to commit sexually violent offenses.
McAllister noted that M.L.V. had a history of alcohol dependence, drug abuse and depressive disorder NOS. M.L.V. also suffers from an anti-social personality disorder. McAllister testified that M.L.V. had a history of anti-social behavior going back to his adolescence. McAllister said that M.L.V. committed criminal acts "without regard for the effects on other people" and "without conscience."
In support of his opinions, McAllister also pointed to M.L.V.'s "failure to sustain treatment advances." McAllister had reviewed M.L.V.'s treatment records. He explained that M.L.V. interacted with the persons providing treatment but M.L.V. had not been truly honest about his offenses and, consequently, he had not gotten to the "crux" of his deviant sexual arousal. McAllister opined that M.L.V. had made some progress in the area of his personal psychotherapy and appeared to be a more stable person than previously when he was actively resisting therapy but, according to McAllister, M.L.V. lacks a "fundamentally sound understanding of his deviant sexual arousal."
McAllister further opined that M.L.V. would have great difficulty controlling his deviant sexual urges. As a consequence of his personality disorder, M.L.V. has had "grave difficulties" in relationships. He has experienced, entertained and acted on his deviant sexual urges. That aspect of M.L.V.'s personality disorder "lends itself very strongly to re-offending." McAllister said that another aspect of M.L.V.'s personality disorder involves "cunning, manipulating, deceiving, [and] lying" which impairs the benefits of treatment that would forestall re-offending. In addition, M.L.V. has "conscience impairment" which lends itself to re-offending.
Barone rendered a report in which she concluded that M.L.V. presents a significant risk to engage in future acts of deviant sexual behavior if released into the community. She testified that M.L.V.'s score on the Static 99 placed him in a high-risk category for sexual recidivism. Barone diagnosed M.L.V. as suffering from paraphilia NOS as well as anti-social personality disorder. Barone stated that the combination of paraphilia and anti-social personality disorder "has been shown through the research as being the most robust predictor of sexual recidivism."
Barone opined that M.L.V. presents a significant risk for sexual reoffending. She further opined that M.L.V. is a man with a diagnosable paraphilia, marked by deviant sexual arousal. His sexual pathology is "driven" by a personality that is marked by an inability to control impulses and abide by societal norms. Moreover, his sexual pathology "is relatively severe." She explained that this pathology had "an early onset" and there was a diverse source of "deviant preferences," evidenced by the ages of his victims.
M.L.V.'s sexual pathology also was aggressive and involved weapons and humiliation of his victims. Barone added that M.L.V. is a person skilled at manipulation, having in the past convinced those providing treatment to him that he was rehabilitated, yet his behavioral history has "proven otherwise." Barone opined that if M.L.V. were released to the community, he would not be able to control his deviant sexual impulses.
While accepting the testimony of the State's experts, Judge Freedman accorded little weight to the testimony of Donna LoBiondo, Ph.D. (LoBiondo), who was presented as a witness for M.L.V. LoBiondo agreed that M.L.V. was suffering from *295 paraphilia. However, LoBiondo asserted that she found "no clear evidence for the persistence of [this] diagnosis."
In our view, Judge Freedman properly exercised his discretion as fact finder in rejecting LoBiondo's view that M.L.V.'s paraphilia was in remission. The judge reasonably found that LoBiondo's reasoning regarding the 1995 offense was unconvincing because the evidence showed that the incident was sexually motivated, the victim was tied up and M.L.V. had endeavored to minimize the seriousness of the offense. We must defer to the findings of the trial judge when, as in this case, the findings are based on sufficient evidence in the record, considering the record in its entirety, "with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Close v. Kordulak Bros., 44 N.J. 589, 599, 210 A.2d 753 (1965) (citing State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)).
M.L.V. argues, however, that the judge made indiscriminate use of hearsay in his decision in this case. We do not agree. The record shows that the State's experts relied in part upon information in the pre-sentence investigation (PSI) reports as a basis for their opinions. We have held that while consideration of such information is permissible, it "should not be accepted uncritically." In re Civil Commitment of A.E.F., 377 N.J.Super. 473, 490, 873 A.2d 604 (App.Div.2005). We are satisfied that in this matter there was no uncritical acceptance by the State's experts of statements in the PSI reports.
Indeed, we are not dealing in this case with unproven allegations. M.L.V. was convicted of two rapes. He was convicted of breaking and entering while armed. He also was convicted of a simple assault arising from what M.L.V. concedes was an encounter with a prostitute, in which he bound her with a rope after she refused to engage in sexual intercourse and refused to return his money. In addition, M.L.V. pled guilty to soliciting a prostitute. Although M.L.V.'s statements regarding these offenses differed in some details from the official description of the incidents and the statements of certain of his victims, M.L.V. confirmed the essential details of the offenses in his interviews with McAllister and others who treated him.
Moreover, M.L.V. made other statements that were relied upon by the State's experts for their evaluations. In his October 20, 2003 report, McAllister reviewed those statements and concluded that M.L.V. had been unable to forthrightly discuss his offenses. He found that M.L.V. has denied and minimized the coercion and terrorizing aspects of his offenses and endeavored "to avoid directly addressing his deviant sexual excitement." McAllister also stated that M.L.V.'s statements showed an attempt to present himself in a favorable fashion but he had demonstrated "little or no real empathy when discussing his victims." McAllister concluded that M.L.V. had shown "poor progress" in his sex offender treatment. He opined that because M.L.V. had not shown "substantial treatment advances," he remained "at significant risk to sexually reoffend if released."
Clearly, it was proper for the experts to rely upon M.L.V.'s own statements in formulating their diagnoses and opinions. Furthermore, the judge did not err in considering M.L.V.'s statements for their truth because his prior statements were admissible under N.J.R.E. 803(b)(1) as statements of a party. See In re Civil Commitment of E.S.T., 371 N.J.Super. 562, 576, 854 A.2d 936 (App.Div.2004).
In addition, although the State's experts reviewed reports of M.L.V.'s prior psychological/psychiatric evaluations, the State's *296 experts did not base their diagnoses and opinions on complex diagnoses made by others. As we stated in A.E.F., N.J.R.E. 703 does not "provide a basis for wholesale and uncritical admission of prior forensic evaluations" in an SVPA commitment proceeding. Id. at 492, 873 A.2d 604,. Here, McAllister and Barone made their own evaluations of M.L.V. and testified about their findings at the hearing. Their opinions were their own, not those of others. A.E.F., supra, 377 N.J.Super. at 492, 873 A.2d 604.
We have considered the other arguments raised by M.L.V. and find them not to be of sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] The MnSOST-R is an actuarial instrument which measures sexual recidivism by taking into account certain static factors (historical facts that do not change over time) and attempts to capture certain dynamic factors (such as an individual's participation in treatment). The Static 99 is another actuarial instrument used to predict sexual recidivism. In re Commitment of R.S., 339 N.J.Super. 507, 517-19, 773 A.2d 72 (App.Div.2001), aff'd o.b., 173 N.J. 134, 801 A.2d 219 (2002).